**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ACTION NISSAN, INC.,
d/b/a UNIVERSAL HYUNDAI,

    Plaintiff,

vs.                                                  Case No. 6:06-cv-1747-Orl-19KRS

HYUNDAI MOTOR AMERICA,

    Defendant.
_____/

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, Hyundai Motor America ("HMA"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 3.01(a), moves the Court for entry of summary judgment in its favor as to each of the four counts contained in the complaint of Plaintiff, Action Nissan, Inc. d/b/a Universal Hyundai ("Universal"), a Hyundai dealer operating in Orlando, Florida.

Although Universal's complaint alleges four causes of action against HMA, all four concern the Hyundai dealer advertising association and are premised on the allegation that two other Hyundai dealers were improperly designated as "single-point" dealers instead of being required to participate in the Orlando, Florida advertising group. Universal asserts that because of this improper designation that allowed those two dealers to recover the amounts collected by HMA for advertising and to spend those amounts on their own advertising, Universal suffered a competitive disadvantage and "effectively" paid more for Hyundai products than did those two dealers. Even accepting those allegations as true (which HMA disputes): i) Universal signed two releases in 1999 and 2002 that preclude all four claims; ii)

7832385.1

there is no evidence that HMA established an unfair or inequitable vehicle allocation system in violation of section 320.64(18), Florida Statutes; and iii) Universal's breach of fiduciary claim is barred by the economic loss rule.  As set forth more fully below, HMA is entitled to summary judgment on all counts.

**I.      STATEMENT OF FACTS**

**A.      The Hyundai Dealer Advertising Associations**

HMA distributes Hyundai motor vehicles in the United States.  Universal is a Hyundai dealer.  Like dealers for other line-makes, Hyundai dealers participate in a cooperative advertising association for joint advertising among Hyundai dealers. (Zielomski p. 89.) [1]  The Dealer Sales and Service Agreement ("Dealer Agreement") between HMA and Universal provides in relevant part:

> **3.      Hyundai Dealer Advertising Association**
>
> HMA and DEALER recognize the benefits which may be derived from a comprehensive joint advertising effort by Hyundai Dealers. Accordingly, HMA agrees to assist Hyundai Dealers, including DEALER, in the establishment of a cooperative advertising association. DEALER agrees to cooperate with HMA in the formation of such association and, once it is established, to participate actively and to contribute to it in accordance with the by-laws of the association.
>
> The Hyundai Dealer Advertising Association will finance its advertising programs through the assessment of a fixed amount for each new Hyundai Motor Vehicle purchased by Hyundai Dealers. As a service to the Dealer Association, HMA will collect the agreed amount, provided that the Association maintains control over the amount of the assessment and the manner in which the funds are expended and so long as such funds are expended for the promotion of Hyundai Products which may also include Parts and Service advertising campaigns from time to time.

---

[1]  A list of deposition transcripts and other documents filed in support of this motion, and the method of citation, are contained in the attached Appendix.

(Nero Ex. 3, pp. 7-8.)

Hyundai dealers have established separate regional HDAAs. (Zielomski p. 13; O'Neill p. 34.) The Southern Regional Advertising Association, Inc. ("Regional HDAA") was established in 1986. (Zielomski p. 14, 69-70; Nero Ex. 7; Ex. F – Articles of Incorporation.) Within the Regional HDAA, Hyundai dealers were grouped into local markets. (Zielomski, p. 15.) The dealers within each market or "local HDAA" determined the amount of their assessments and how they would utilize the resulting pooled funds for advertising. (Zielomski p. 17.) For example, in the Orlando HDAA, the assessments paid by the Orlando-area Hyundai dealers were pooled and used to purchase advertising in the Orlando market. (Zielomski p. 16, 66, 71, 105.) The Orlando HDAA dealers paid advertising assessments at the rate of 3% of the wholesale cost of each new vehicle. (Nero p. 51.) Universal has been a member of the Orlando HDAA since it became a Hyundai dealer. (Nero p. 35-36.)

Coastal Hyundai ("Coastal") has been a Hyundai dealer in Melbourne, Florida since the early 1990s. (O'Neill p. 118; Nero p. 87.) Cocoa Hyundai ("Cocoa") in Cocoa, Florida, became a Hyundai dealer in 2000. (O'Neill p. 118; Nero p. 87; Nelson p. 14.) From their inception through April 2005, Coastal and Cocoa were not included in the Orlando HDAA and were classified instead as "single-point" dealers for HDAA advertising purposes. (Zielomski p. 103-104, 154; Nero 89-90; O'Neill p. 118-119.) Like the Orlando HDAA dealers, Coastal and Cocoa paid advertising assessments of 3%. (Zielomski p. 103; Nelson p. 29, 33.) As single-point dealers, Coastal and Cocoa's assessments were not pooled with the Orlando HDAA dealers' funds. (Nelson p. 29-31; Zielomski p. 97-98.) In order to utilize

their assessments, Coastal and Cocoa had to create and place Hyundai ads, and submit invoices to the Regional HDAA's ad agency and accountant for reimbursement.  (Zielomski p. 103; Nelson p. 31, 114-115.)  The only resulting difference was that Universal's advertising assessments were pooled with the other Orlando dealers' assessments and spent collectively by the Orlando HDAA dealers on advertising, while Coastal and Cocoa's advertising assessments were spent for advertising in Brevard County.  (Nelson p. 29-31.)

B.     **HMA's Allocation System**

Universal alleges that because of the way HMA allegedly "funneled" Coastal and Cocoa's advertising assessments back to those two dealers, Universal effectively paid 3% more for each vehicle.  (DE 2, ¶ 16-17.)[2]  As a result, Universal allegedly suffered a "competitive disadvantage . . . due to the disparity in purchase price" and Cocoa and Coastal were able to sell more vehicles and therefore were allocated more vehicles.  (DE 2, ¶ 17, 34.)

HMA's system of allocating motor vehicles among its dealers is known in the industry as a "turn and earn" system.  (Nero p. 129-130; 135.)  Turn and earn is a common allocation system used by other automobile manufacturers and distributors.  (Nero p. 135.)  In brief, HMA allocates vehicles to each dealer based on the number of vehicles the dealer sold in a prior period.  (Nero p. 130.)  Twice a month, HMA offers each Hyundai dealer an allocation of vehicles that the dealer may accept or reject.  (Nero 135-136.)  Universal typically does not accept every vehicle allocated to it.  (Nero p. 136.)  Dealers that want more vehicles than are initially allocated can request additional vehicles from a pool of vehicles

---

[2] Citations to pleadings are to the docket entry number followed by page or paragraph number, e.g., "DE __, ¶__."

rejected by other dealers. (Nero p. 138.) The Dealer Agreement clearly states that HMA is not obligated to "sell [Universal] any particular number of vehicles." (Nero Ex. 3, p. 3a.)

Bill Nero is the President and sole owner of Universal. (Nero Ex. 3, p. 2; Nero p. 14.) When asked about HMA's allocation system in his deposition, Mr. Nero stated that Universal was allocated fewer vehicles because of the alleged disparity in the vehicle purchase price paid by Universal as compared to the price paid by Coastal and Cocoa.[3] (Nero p. 139-140.) That is, Universal allegedly sold fewer vehicles and therefore was allocated fewer vehicles. (*Id*.) However, Mr. Nero could not identify any aspect of HMA's allocation *system* that was unfair, inequitable, discriminatory or not supported by reason or good cause:

> Q: Explain to me what is it about Hyundai's allocation system that is unfair in your mind?
>
> A: I'm not sure I can answer that question. Obviously if I have the ability to sell more cars, I earn more of the cars that are the fast movers, and hence I have an opportunity to retail more vehicles. But I'm not sure that I feel that there is anything unfair that I'm aware of of the system, other than it's based on turn and earn, and you sell the cars to earn the cars. That's fine as long as we all have the same price to sell from and we receive the same incentives and factory treatment as a competing Hyundai dealer.
>
> Q: So if I understand you correctly, you are saying that it is not the system, it's that you were discriminatorily charged in the price of the vehicle and that caused you to sell those vehicles and therefore get allocated less vehicles?
>
> A: That's correct.
>
> Q: With regard to whether or not the Hyundai allocation is inequitable, would your answer be the same?

---

[3] Mr. Nero testified as Universal's Rule 30(b)(6) representative on the subjects of "Universal's allocation of motor vehicles from HMA" and "[t]he allegations in Count III of Universal's complaint regarding HMA's alleged violation of § 320.64(18), Florida Statutes, HMA's alleged misallocation of vehicles, and alleged suffering by Universal of discrimination and damages in the allocation of vehicles by HMA." (Nero p. 6; Ex. E, p. 3.)

> A: Yes, it would be the same.
>
> Q: Would you say that the Hyundai allocation system is unreasonably discriminatory?
>
> A: No, I don't.
>
> . . .
>
> Q: Is the HMA allocation system generally speaking to the extent that you know not supported by reason or good cause?
>
> A: I believe it is.
>
> Q: Is the HMA allocation system generally speaking unfair?
>
> A: No, I don't think so.

(Nero pp. 139-141) (objections omitted).  Nothing in Mr. Nero's testimony even suggests that HMA established an allocation system that was unfair, inequitable, discriminatory or unreasonable.

**C.    Releases**

Universal executed two releases for any claims it may have against HMA. Universal's current Dealer Agreement, executed in 2002, provides in relevant part:

> Upon execution of this Agreement by DEALER, and in consideration of HMA entering into this Agreement, DEALER hereby releases HMA from any and all claims, demands, contracts and liabilities (including, but not limited to, statutory liabilities) known or unknown, of any kind whatsoever, arising out of or in connection with any prior agreements, business transactions, course of dealing, discussions or negotiations between the parties prior to the effective date hereof and regardless of whether DEALER knows or suspects the claim to exist in its favor at the time of executing the release and whether or not if known to it, it would have materially affected its release hereunder.

(Nero Ex. 3, ¶19.C, p. 27.)  Both Coastal and Cocoa were already single-point dealers for HDAA purposes when Universal executed this release in 2002. (Zielomski p. 103-104, 154; Nero 89-90; O'Neill p. 118-119.)

In connection with an unauthorized relocation of the dealership and proposed termination by HMA, Universal executed a settlement agreement in June 1999 that also contained a release:

> Universal Hyundai and its Shareholders hereby release, acquit, and agree not to sue HMA for any act committed by HMA with respect to its Hyundai dealership prior to the date of this Agreement.

(Nero Ex. 4, ¶12, p. 3.)  Coastal was already a single-point dealer when Universal executed this settlement agreement in June 1999. (Zielomski p. 103-104, 154; Nero 89-90; O'Neill p. 118-119.)

## II.   LEGAL AUTHORITY AND ARGUMENT

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  A party seeking summary judgment bears the initial burden to demonstrate the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact.  *Celotex*, 477 U.S. at 323; *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  Where, as here, the "terms of the contract are unambiguous," summary judgment is appropriate under both Rule 56 and Florida contract law.  *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 905 (11th Cir. 1998).  Because statutory interpretation is "an issue of law for the court," statutory construction issues are likewise amenable to summary judgment.  *Access Now, Inc., v.*

*Ambulatory Surgery Center*, 2001 WL 617529, *2 (S.D. Fla. May 2, 2001) (citing *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 933 (11th Cir. 2000) and *Royal Caribbean Cruises, Ltd. v. U.S.*, 108 F.3d 290 (11th Cir. 1997)).

A. **Summary Judgment Should Be Granted on All Counts Because Universal Released Its Claims.**

All of Universal's claims in this case are based on the alleged improper designation of Coastal and Cocoa as single-point dealers. Universal alleges that this designation placed Universal at a competitive disadvantage and effectively allowed Coastal and Cocoa to receive Hyundai Products at lower prices and effectively caused Universal to pay higher prices for Hyundai Products. Universal further alleges that this effective price differential caused it to sell fewer vehicles and affected its allocation of vehicles. However, the basis for these claims – the designation of Coastal and Cocoa as single-point dealers – occurred *prior* to the time Universal executed the 2002 release (and, with respect to Coastal, also *prior* to the time Universal executed the 1999 release). (Zielomski p. 103-104, 154; O'Neill p. 118-119; Nero 89-90; Nero Ex. 3, ¶19.C, p. 27;  Nero Ex. 4, ¶12, p. 3.)  The 2002 release expressly provides that Universal releases all claims it had at that time against HMA, whether known or *unknown*. (Nero Ex. 3, ¶19.C, p. 27.)

In a case nearly on all fours with this one, Judge Presnell held that a release contained in a 2003 dealer agreement barred common law claims that "can be related back to events that occurred prior to the execution of the 2003 Agreement . . ." *First Class Coach and Equipment, Inc. v. Thomas Built Buses, Inc.*, 2006 WL 269983, at *6 (M.D. Fla. 2006).  This was true even though the alleged misconduct continued after 2003. Thus, under *First Class Coach*, because each of Universal's claims necessarily existed in 2002 (as Coastal and Cocoa

had been operating as single-point dealers for several years at that point), Universal has released HMA for liability with respect to each of its claims.[4] Summary judgment should therefore be granted in HMA's favor.

**B.      Universal's Unfair Allocation System Claim Fails Under the Plain Language of the Statute.**

Universal alleges in Count III of the complaint (DE 2, ¶31-37) that the designation of Coastal and Cocoa as single-point dealers for HDAA purposes violated section 320.64(18), Florida Statutes, which prohibits:

> Establish[ing] a *system* of motor vehicle allocation or distribution or . . . implement[ing] a system of allocation or distribution of motor vehicles to one or more of its franchised motor vehicle dealers which is unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the affected motor vehicles dealer or dealers. An applicant or licensee shall maintain for 3 years records that describe its methods or formula of allocation and distribution of its motor vehicles and records of its actual allocation and distribution of motor vehicles to its motor vehicle dealers in this state.

(Emphasis added.) Where, as here, "the statute is clear and unambiguous, courts will not look behind the statute's plain language for legislative intent or resort to rules of statutory construction to ascertain intent. In such instance, the statute's plain and ordinary meaning must control," unless that would lead to an absurd result. *Daniels v. Florida Dept. of Health*,

---

[4] With respect to Count III (violation of § 320.64(18), Fla. Stat. – unfair allocation system), § 320.64(20) prohibits a prospective release of a claim that a distributor has violated any provision of §§ 320.60-320.70. *See also First Class Coach and Equipment, Inc. v. Thomas Built Buses, Inc.*, 2006 WL 269983, at *6, n.20 (M.D. Fla. 2006). However, the actions complained of here, *e.g.*, the designation of Coastal and Cocoa as single point dealers, occurred prior to November 20, 2002, when Universal executed the second release. All subsequent treatment of Coastal and Cocoa's advertising assessments resulted from the initial classification of these dealers as single points. Therefore, the release operates to relieve HMA of liability for its alleged conduct prior to the release, and not prospectively. To the extent that Universal's § 320.64(18) claim arose after 2002, which it did not, HMA does not seek summary judgment on the basis of the releases.

898 So. 2d 61, 64 (Fla. 2005).  Here, the language of the statute is clear and unambiguous:  it applies solely to the "*system* of allocation or distribution of motor vehicles." § 320.64(18), Fla. Stat. (emphasis added.)  The clarity of that language is further illuminated by the later reference in the statute to "methods or formula of allocation and distribution of its motor vehicles."  *Id*.  Under this plain language, the intent of the statute is clear—it does not seek to regulate all aspects of the sales relationship between the manufacturer and dealer—but only the allocation *system*.[5]

Consistent with these principles and the plain language of the statute, Florida courts have limited Section 320.64(18) strictly to its terms.  *See, e.g*., *Bert Smith Oldsmobile, Inc. v. GMC*, 2005 WL 1210993, *4 (M.D. Fla. May 20, 2005) (holding that Section 320.64(18) could not be used to challenge termination of Oldsmobile line because that statute only "protects Plaintiff from unfair, inequitable, and unreasonably discriminatory distribution or allocation as compared to other Oldsmobile dealers.").  In considering whether a given allocation system is reasonable, the Eleventh Circuit in *Chevrolet Porsche Audi, Inc., v. American Honda Motor Co*., looked solely to the terms of the allocation system itself and whether the allocation system actually was administered consistently with its terms, and determined that there was nothing unreasonable about "a system under which allocations are based essentially on a dealer's sales record and under which a certain number of cars are

---

[5] A broader interpretation of section 320.64(18) would cause distributors to be in violation of the statute anytime a distributor impacts a dealer's sales.  Universal's apparent theory is that HMA's alleged action respecting two other dealers resulted in Universal selling less vehicles and therefore being allocated less vehicles.  Universal's claim, if granted, would result in this statute being applied to any action by a distributor that arguably impacts a dealer's sales, and therefore its allocation system.  There is simply no basis in the statutory language to find that the legislature intended Section 320.64(18) to have such broad effect.

reserved to replace damaged cars, to help supply new dealerships, and to encourage dealers to establish exclusive facilities for Honda cars." 773 F.2d 1193, 1208 (11th Cir. 1985).[6] Indeed, HMA is aware of no case under any law that holds that an allocation system premised on past sales is unreasonable or discriminatory.

Here, it is undisputed that HMA's allocation system is premised on past sales and is common in the industry. (Nero p. 130, 135.) As a matter of law, such an allocation system is reasonable. *Cabriolet*, 773 F.2d at 1208. Moreover, the dealer principal of Universal has admitted that there is no aspect of the allocation *system* that is unreasonable, discriminatory, or unsupported by good cause. (Nero pp. 140-141.) And with no evidence that HMA's allocation system is unreasonable, discriminatory, or unsupported by good cause, there can be no violation of Section 320.64(18), Florida Statutes.

**C.     Universal's Breach of Fiduciary Duty Claim Is Barred by the Economic Loss Rule Because It Duplicates Universal's Breach of Contract Claim.**

Universal alleges in Count IV that HMA owed and breached a fiduciary duty to Universal. (DE 2, ¶ 38-45.) Even if HMA was a fiduciary of Universal—which it was not—Universal's breach of fiduciary duty claim would still fail under the economic loss rule. "The economic loss rule bars causes of actions in tort between parties to a contract unless there is proof of personal injury or property damage independent of a breach of the contract." *Clayton v. State Farm Mut. Auto. Ins. Co.*, 729 So. 2d 1012, 1013 (Fla. 3d DCA 1999). "When the parties are in contractual privity, a tort action is barred where a defendant has not

---

[6] While *Cabriolet* does not make clear under what law it is assessing the reasonableness of this allocation system, its reasoning regarding the allocation system is applied throughout the opinion to breach of contract, Automobile Dealer's Day in Court Act, and Chapter 320, Florida Statutes claims. *See generally* 773 F.2d at 1208-14.

7832385.1                                                       11

committed a breach of duty apart from a breach of contract." *Florida Gaming Corp., v. Affiliated FM Ins. Co.*, 2007 WL 2591136, *3 (S.D. Fla. Aug. 3, 2007). Put another way, a plaintiff generally may not seek to recover economic loss from an alleged tort which "relates to the performance of the contract." *Taylor v. Maness*, 941 So. 2d 559, 564 (Fla. 3d DCA 2006). "The prohibition against tort actions to recover solely economic damages for those in contractual privity is designed to prevent parties to a contract from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort." *Indemnity Ins. Co. of N. Am. v. American Aviation, Inc.*, 891 So. 2d 532, 536 (2004). Following the Florida Supreme Court's decision in *American Aviation*, *id*. at 542, courts have held that the economic loss rule applies to breach of fiduciary duty claims which do not involve the provision of professional services and which "are based upon and inextricably intertwined with [the plaintiff's] claim for breach of contract." *Granat v. AXA Equit. Life Ins. Co.*, 2006 WL 3826785, *5 (S.D. Fla. 2006); *see also North American Clearing, Inc. v. Brokerage Computer Sys.*, Inc., 2008 WL 341309, *4 (M.D. Fla. Feb. 5, 2008).

In this case, there is no claim that HMA is a professional (such as a therapist or lawyer). Moreover, the damages being sought are purely economic. *American Aviation*, 891 So. 2d at 536 n.1 ("Economic losses are, simply put, disappointed economic expectations."). Most importantly, the breach of contract and breach of fiduciary duty claims are indeed intertwined. Both claims rest upon the exact same allegations. (*See* Compl. ¶¶ 20 (realleging Paragraphs 1-18 as basis for contract claim), 38 (realleging Paragraphs 1-18 as basis for breach of fiduciary duty claim).) Both claims spring from the exact same alleged wrongdoing – the collection and distribution of advertising assessments and the designation

of Cocoa and Coastal as single-point dealers. (*Id.*) Both claims seek the exact same damages. (*Compare id.* at 6 (Count I *ad damnum* clause) *with id*. at 10 (Count IV *ad damnum* clause).) Accordingly, "the breach of fiduciary duty claim is inextricably intertwined and dependent upon the breach of contract claim . . . [and] must be dismissed." *Granat*, 2006 WL 3826785, at *5.

## III.    RELIEF REQUESTED

For the foregoing reasons, summary judgment should be granted to HMA on all claims.

Respectfully submitted:

/s/ J. Andrew Bertron, Jr.
_____

Dean Bunch, Fla. Bar No. 172351
Melissa Fletcher Allaman, Fla. Bar No. 229229
J. Andrew Bertron, Jr., Fla. Bar No. 982849
Sutherland Asbill & Brennan LLP
3600 Maclay Blvd. S., Suite 202
Tallahassee, Florida  32312-1267
Phone: (850-907-2507 - Bertron
Fax:     (850) 907-2501
andy.bertron@sablaw.com
*Attorneys for Defendant Hyundai Motor America*

### CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on Kenneth L. Paretti, Esq. (kparetti@adamsquinton.com) and A. Edward Quinton, III, Esq. (equinton@adamsquinton.com), Adams, Quinton & Paretti, P.A., 80 S.W. Eighth St., Suite 2150, Miami, FL 33130, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

/s/ J. Andrew Bertron, Jr.
_____

## APPENDIX, INDEX AND CITATIONS

A.   Filed Documents

In support of this motion, HMA has filed the following:

| Exhibit # | Description | Pages |
|---|---|---|
| A. | Sandy Zielomski deposition transcript | Transcript pages 13-17, 66-71, 89, 97-98, 103-105, 154 |
| B. | Finbarr O'Neill deposition transcript | Transcript pages 34, 118-119 |
| C. | William Nero deposition transcript and exhibits | Transcript pages 6, 35-36, 51, 87-90, 129-130, 135-141<br><br>Deposition exhibits: 3, 4, 7 |
| D. | Bruce Nelson, Jr. deposition transcript | Transcript pages 14, 29-33, 114-115 |
| E. | Deposition Notice of Universal Hyundai 30(b)(6) representative | Pages 1-5 |
| F. | Certified copy of the articles of incorporation of Southern Regional Advertising Group, Inc. | 6 pages total |

B.   Citations

Citations to deposition transcripts are to the deponent's name followed by the page number, e.g., "Zielomski p. 1." Citations to deposition exhibits shall be the deponent's name followed by the exhibit number and page within the exhibit, *e.g.*, "Zielomski Ex. 1, pp. 1-2."

7832385.1