**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ACTION NISSAN, INC., d/b/a Universal Hyundai,**

**Plaintiff,**

**-vs-**                                          **Case No.  6:06-cv-1747-Orl-19KRS**

**HYUNDAI MOTOR AMERICA,**

**Defendant.**

_____

# ORDER

This case comes before the Court on the following:

1.      Motion for Summary Judgment by Defendant Hyundai Motor America (Doc. No. 39, filed Feb. 28, 2008);

2.      Response and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment by Plaintiff Action Nissan, d/b/a Universal Hyundai (Doc. No. 58, filed Mar. 31, 2008);

3.      Motion for Partial Summary Judgment and Incorporated Memorandum of Law by Plaintiff (Doc. No. 71, filed Apr. 15, 2008);

4.      Notice of Filing Exhibits to Plaintiff's Motion for Partial Summary Judgment by Plaintiff (Doc. No. 85, filed Apr. 22, 2008);

5.      Second Motion for Summary Judgment by Defendant (Doc. No. 101, filed May 13, 2008);

6.      Opposition to Plaintiff's Motion for Summary Judgment by Defendant (Doc. No. 103, filed May 15, 2008); and

7.      Response and Memorandum of Law in Opposition to Defendant's Second Motion for Summary Judgment by Plaintiff (Doc. No. 105, filed May 15, 2008).

## Background

## I.      Procedural History

Plaintiff Action Nissan, Inc., doing business as Universal Hyundai, brought this action against Defendant Hyundai Motor America alleging breach of contract (Count I); breach of the implied covenants of good faith and fair dealing (Count II); violation of Florida's Dealer Protection Act ("DPA"), § 320.64(18), Fla. Stat. (2006)[1] (Count III); and breach of fiduciary duty (Count IV). (Doc. No. 2 at 1-11, filed Nov. 13, 2006.)  Defendant has filed two Motions for Summary Judgment, and Plaintiff has filed a Motion for Partial Summary Judgment.  (Doc. Nos. 39, 71, 101.)  All Motions are opposed.  (Doc. Nos. 58, 103, 105.)

## II.      Undisputed Facts

Plaintiff has been a Hyundai new motor vehicle franchised dealer with Defendant since 1996. (Doc. No. 2 at 2, ¶ 6; Doc. No. 6 at 2, ¶ 6.)  In November of 2002, Plaintiff and Defendant renewed their contractual relationship by signing a Hyundai Motor America Dealer Sales and Service Agreement ("the franchise agreement").  (Doc. No. 2 at 2, ¶ 6; *id.* at 13-19; Doc. No. 6 at 2, ¶ 6.) This agreement explicitly incorporated the Hyundai Motor America Dealer Sales and Service Agreement Standard Provisions.  (Doc. No. 2 at 2, ¶ 7; *id.* at 21-46; Doc. No. 6 at 2, ¶ 7.)  The standard provisions provided for the creation of a dealers' cooperative advertising association, the

---

[1]      The injury alleged by Plaintiff began in approximately 1999 and ended in 2005. (Doc. No. 2 at 3-4, ¶ 14.)  The relevant statutory language remained the same during this time period and did not change until 2008.  Because Plaintiff filed its Complaint in 2006, the Court will cite to the 2006 codification of the DPA to ensure application of statutory language in effect at the time the suit was filed.

Hyundai Dealer Advertising Association ("HDAA").  (Doc. No. 2 at 23-24.)  The HDAA was to be financed through Defendant's collection of "the assessment of a fixed amount for each new Hyundai Motor Vehicle purchased by Hyundai dealers." (*Id.* at 24.)  Defendant would then transfer these funds to the appropriate regional HDAA for use in area advertising.  (*Id.*; Doc. No. 39-2 at 12.)  As explained in the franchise agreement, Defendant collected the assessments "[a]s a service to the [HDAA] . . . provided that the [HDAA] maintains control over the amount of the assessment and the manner in which the funds are expended" and "so long as such funds are expended for the promotion of Hyundai Products . . . ."[2]  (Doc. No. 2 at 24.)

In February of 1986, an HDAA for the Southern region of the United States was established, called the Southern Regional Advertising Group, Inc. ("SRAG").  (Doc. No. 2 at 2, ¶ 9; Doc. No. 39-7.)  The SRAG was a non-profit Georgia corporation created to provide "common and joint advertising . . . to promote the sale of Hyundai motor cars by authorized dealers in the Southern Region of Hyundai Motor America."  (Doc. No. 39-7 at 3.)  The By-Laws of the SRAG similarly indicate that the purpose of the organization was "to arrange for regional advertising in the geographical area wherein Members are located."[3]  (Doc. No. 39-4 at 60.)  The membership of the SRAG was made up entirely of Hyundai new motor vehicle dealers in the region.  (*Id.* at 60-61.)  The Board of Directors was also limited to member Hyundai dealers.  (*Id.* at 64.)  Defendant did not

---

[2]    The franchise agreement did not otherwise discuss how the advertising assessments were to be spent.

[3]    The By-Laws of the SRAG did not specify how its funds were to be spent. Plaintiff's Application for HDAA Membership, however, stated, "The Undersigned hereby agrees to pay to said Association assessments, as stipulated in the Association By-Laws, in consideration of the mutual promises of other Hyundai Dealer members of the Association to so contribute and the Association to allocate such funds for intended purposes."  (Doc. No. 103-4 at 30.)

have any ownership interest in the SRAG, was not a member of the organization, and did not hold a place on its Board of Directors.  (Doc. No. 39-2 at 5-6, 13; Doc. No. 101-2 at 7; Doc. No. 105-13 at 4; Doc. No. 105-17 at 3.)

The Southern region was further subdivided by advertising markets, also known as areas of dominant influence ("ADIs") or dominant market areas ("DMAs").  (Doc. No. 39-2 at 10; Doc. No. 58-2 at 47-51; Doc. No. 85-8 at 9; Doc. No. 105-13 at 12.)  Orlando was one such market.  (Doc. No. 105-13 at 15.)  Dealers within each advertising market would meet as a local HDAA and decide how to use to the funds allocated to that market by the SRAG.  (Doc. No. 101-2 at 4-6; Doc. No. 105-13 at 3-4; Doc. No. 105-18 at 2.)

Pursuant to the franchise agreement, Defendant was supposed to collect advertising assessments from the dealers in the SRAG at a rate selected by the Board of Directors of the SRAG: three percent of the price of each new vehicle purchased by the member dealers from Defendant.  (Doc. No. 39-4 at 60-61; Doc. No. 58-2 at 3, ¶ 7.)  Defendant then was to transfer these assessment funds to the SRAG.  (Doc. No. 39-2 at 12.)  The SRAG in turn allocated these funds to local markets for "Tier Two" advertising.  (*Id.* at 7-8; Doc. No. 58-2 at 32-34; Doc. No. 85-9 at 6-7.)  This type of advertising benefitted the local market as a whole and promoted particular Hyundai products.  (Doc. No. 58-2 at 32-34.)  Dealers were individually responsible for "Tier Three" advertising which promoted their particular dealership.  (*Id.*)

Two Florida dealerships within the Orlando market, Coastal Hyundai ("Coastal") and Cocoa Hyundai ("Cocoa"), were designated as single point dealers.  (Doc. No. 85-7 at 16; Doc. No. 85-8 at 19.)  This meant that these two dealerships were considered their own advertising submarket and not technically part of the Orlando HDAA.  (Doc. No. 105-13 at 15-16.)  While they still paid

advertising assessments to Defendant, these dealers could and did seek reimbursement for their individual dealership advertising. (*Id.*) Plaintiff learned about the submarket designation of Coastal and Cocoa in 2005. (Doc. No. 58-2 at 4, ¶ 8.) Since these dealers were located within Plaintiff's market, Plaintiff argues that they were reaping the benefits of the Orlando HDAA's Tier Two advertising for that market, paid in part by Plaintiff's assessment. (Doc. No. 2 at 4, ¶¶ 15-17.) Thus, Plaintiff was paying its share of Tier Two advertising and paying out of pocket for Tier Three advertising, whereas Coastal and Cocoa's Tier Two payments were "funneled back" to them and used to pay for their Tier Three advertising. (*Id.*) Plaintiff contends that this arrangement violates several contractual, statutory, and common law obligations owed to it by Defendant.

## Standard of Review

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp.*, 357 F.3d at 1259. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In determining whether the moving party has satisfied

its burden, the court considers all inferences drawn from the underlying facts in the light most

favorable to the party opposing the motion and resolves all reasonable doubts against the moving

party.  *Anderson*, 477 U.S. at 255.  The court may not weigh conflicting evidence or weigh the

credibility of the parties.  *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

If a reasonable fact finder could draw more than one inference from the facts and that inference

creates an issue of material fact, a court must not grant summary judgment.  *Id.*  On the other hand,

summary judgment must be granted "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which the party will bear

the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.

**Analysis**

**I.       Defendant's First Motion for Summary Judgment (Doc. No. 39)**

Defendant moves for summary judgment on three grounds: (1) "[Plaintiff] signed two

releases in 1999 and 2002 that preclude all four claims," (2) "there is no evidence that [Defendant]

established an unfair or inequitable vehicle allocation system in violation of section 320.64(18),

Florida Statutes," and (3) "Universal's breach of fiduciary claim is barred by the economic loss

rule."  (Doc. No. 39 at 1-2.)  The Court considers these three arguments below.

**A.       Releases**

Defendant first asserts that Plaintiff signed two contractual releases that bar all of its claims

against Defendant.  (*Id.* at 7-9.)  The two releases to which Defendant refers were executed by

Plaintiff in 1999 and 2002 and are described as follows.  (*Id.*)

In June of 1999, Plaintiff and Defendant entered into a settlement agreement concerning Plaintiff's unauthorized relocation of its Hyundai dealership.  (Doc. No. 39-4 at 55-59.)  This agreement included a general release which stated:

> [Plaintiff] and its Shareholders hereby release, acquit, and agree not to sue [Defendant] for any act committed by [Defendant] with respect to its Hyundai dealership prior to the date of this Agreement.

(*Id.* at 57.)  Defendant argues that Coastal was already designated as a single point dealer when Plaintiff executed this settlement agreement; therefore, according to Defendant, Plaintiff has released any claims arising out of Coastal's designation.  (Doc. No. 39 at 7-9.)

In November of 2002, the parties renewed their franchise agreement by signing a new contract which incorporated the same standard provisions that were a part of the parties' original agreement.  (Doc. No. 2 at 13-19, 21-46.)  These standard provisions contained the following release:

> Upon execution of this Agreement by [Plaintiff], and in consideration of [Defendant] entering into this Agreement, [Plaintiff] hereby releases [Defendant] from any and all claims, demands, contracts[,] and liabilities (including, but not limited to, statutory liabilities) known or unknown, of any kind whatsoever, arising out of or in connection with any prior agreements, business transactions, course of dealing, discussions[,] or negotiations between the parties prior to the effective date hereof and regardless of whether [Plaintiff] knows or suspects the claim to exist in its favor at the time of executing the release and whether or not if known to it, it would have materially affected its release hereunder.  Notwithstanding any other provision herein, however, this release does not extend to any accounts payable by one party to the other as a result of the purchase of any Hyundai Products, audit adjustments[,] or reimbursement for any services.

(*Id.* at 43.)  Since both Coastal and Cocoa were designated as single point dealers prior to the execution of this release, Defendant argues, all claims arising from this designation are barred.  (Doc. No. 39 at 6, 8-9.)

In response to Defendant's claims, Plaintiff contends that: (1) Defendant waived the affirmative defense of release by failing to plead it with sufficient specificity in the Answer; (2) the releases do not apply to the present dispute; (3) even if the releases do apply, they should not be given prospective effect; (4) the releases are void because they are contrary to public policy; and (5) the 2002 release is invalid because it is unconscionable.  (Doc. No. 58 at 10-17.)  The Court considers each of these arguments in turn.

### 1. Waiver

In the Answer, Defendant pleads as its seventh affirmative defense:

> [Plaintiff]'s claims are barred, in whole or in part, by the doctrines of estoppel, waiver, unclean hands, laches, the applicable limitations period, accord/satisfaction, novation/release, and/or avoidable consequences.

(Doc. No. 6 at 7, ¶ 7.)  Plaintiff asserts, "Defendant's conclusory reference to 'novation/release' [in its Answer] does not satisfy [Federal Rule of Civil Procedure] 8(a)[4] which requires that the defendant give 'fair notice' of the defense and 'the grounds upon which it rests.'" (Doc. No. 58 at 10-11 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).)  Plaintiff continues:

> By Defendant raising the defense of release for the first time in the Motion for Summary Judgment, Plaintiff did not receive fair notice of this defense as required, as a matter of law, and Plaintiff is severely prejudiced by now having to respond to such a defense under the circumstances.  Accordingly, Defendant's Motion for Summary based upon release should be denied and further Plaintiff moves this Court to strike the affirmative defense as legally insufficient.

---

[4]    Presumably, Plaintiff is referring to Rule 8(b) of the Federal Rules of Civil Procedure which states that a party responding to a pleading must "state in short and plain terms its defenses to each claim asserted against it . . . ." Fed. R. Civ. P. 8(b)(1)(B).  Rule 8(c) provides that a responding party "must affirmatively state any avoidance or affirmative defense, including: . . . release . . . ." Fed. R. Civ. P. 8(c)(1).

(*Id.* at 11.)  Plaintiff then cites several cases in which trial courts have stricken similarly conclusory affirmative defenses as insufficient under the notice pleading standards of the Federal Rules of Civil Procedure.  (*Id.* at 10-11.)

Under Federal Rule of Civil Procedure 12(f), the Court may strike from any pleading an insufficient defense when an appropriate motion is made "*within 20 days* after being served with the pleading."  Fed. R. Civ. P. 12(f) (emphasis added).  A copy of the Answer was served on Plaintiff on November 15, 2006.  (Doc. No. 6 at 9.)  Plaintiff moved to strike the affirmative defense of release on March 31, 2008.  (Doc. No. 58 at 11.)  This far exceeds the twenty day deadline provided in Rule 12(f), and Plaintiff has provided no good cause for the untimeliness of its request.

In rejecting a similar untimely motion to strike a conclusory affirmative defense, United States Magistrate Judge Baker of this District explained:

> Even if the Court were to reach the merits of Plaintiffs' Motion, "[b]oth because striking a portion of a pleading is a drastic remedy and because it often is sought by the movant simply as a dilatory tactic, motions under Rule 12(f) are viewed with disfavor and are infrequently granted."  5A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* § 1380 (2d ed.1990).  "[I]t must be shown that the allegations being challenged are so unrelated to plaintiff's claims as to be unworthy of any consideration as a defense and that their presence in the pleading throughout the proceeding will be prejudicial to the moving party . . . .  Thus, even when technically appropriate and well-founded, they often are not granted in the absence of a showing of prejudice to the moving party."  *Id.*

*Harvey v. Lake Buena Vista Resort, LLC*, __ F. Supp. 2d __, No. 6:07-cv-1641-Orl-DAB, 2008 WL 1843909, at *3 (M.D. Fla. Apr. 22, 2008).  Even when a motion to strike an improperly pled defense is granted, "a defendant will not be precluded from arguing the substantive merits of the affirmative defense later in the case even if the court strikes the affirmative defense on technical grounds."  *Wlodynski v. Ryland Homes of Fla. Realty Corp.*, No. 8:08-cv-361-JDW-MAP, 2008 WL 2783148,

at *2 (M.D. Fla. July 17, 2008) (citing *Microsoft Corp. v. Jesse's Computers & Repair, Inc.*, 211 F.R.D. 681, 684 (M.D. Fla. 2002)).

While Plaintiff is correct that Defendant pleads its affirmative defense of release in a conclusory manner, Plaintiff has failed to demonstrate any prejudice that would warrant the drastic remedy of striking that defense. Plaintiff was a party to both of the releases and cannot claim that it was not aware of their existence. Furthermore, the Answer did provide Plaintiff with some notice that such a defense might be raised, and Plaintiff had the opportunity in discovery to ascertain further details of this defense. In its Response to Defendant's first Motion for Summary Judgment, Plaintiff simply states that it "is severely prejudiced by now having to respond to such a defense under the circumstances." (Doc. No. 58 at 11.) The Court is not persuaded by this general assertion of prejudice, particularly when Plaintiff could have raised the issue at a much earlier date. Therefore, the Court rejects Plaintiff's contention that Defendant has waived this affirmative defense and denies Plaintiff's request to strike such defense.

### 2.   Application to Present Dispute

Next, Plaintiff denies that the releases apply to the present action. Accordingly, the Court must consider whether the releases unambiguously bar Plaintiff's claims.

The Florida Supreme Court has explained, "As with contracts generally, the language used in the release is the best evidence of the parties' intent." *Hurt v. Leatherby Ins. Co.*, 380 So. 2d 432, 433 (Fla. 1980), *quoted in Hernandez v. Gil*, 958 So. 2d 390, 391 (Fla. 3d DCA 2007). When the language of a contract is clear and unambiguous, its interpretation or construction is a matter of law. *Smith v. Shelton*, 970 So. 2d 450, 451 (Fla. 4th DCA 2007) (citation omitted). Whether an ambiguity exists in a contract also is a question of law. *Id.* (citations omitted). Where the wording

of an agreement is ambiguous, its interpretation involves questions of fact, precluding summary disposition. *Id.* (citations omitted). However, a true ambiguity does not exist merely because a document can possibly be interpreted in more than one manner. *Id.* (citation omitted). Whether a document is ambiguous depends upon whether it is *reasonably susceptible* to more than one interpretation. *Id.* (citation omitted).

### a.     1999 Release

The relevant portion of the 1999 release states that Plaintiff agrees not to sue Defendant "for any act committed by [Defendant] with respect to [Plaintiff's] Hyundai dealership prior to the date of this Agreement." (Doc. No. 39-4 at 57.) Thus, Plaintiff's claims against Defendant are barred if: (1) they concern an act committed by Defendant with respect to Plaintiff's Hyundai dealership, and (2) the act occurred prior to the date of the agreement. (*Id.*)

The meaning of the phrase "with respect to" in the release is not clear because it is reasonably susceptible to more than one meaning. "With respect to" could mean only those actions *directed at* Plaintiff's dealership or could mean any actions *affecting* Plaintiff's dealership. This distinction is critical to Plaintiff's claims concerning the designation of Coastal as a single point dealer. Plaintiff asserts that this designation *adversely affected* Plaintiff, though such conduct was *not directed at* Plaintiff's dealership. (Doc. No. 2 at 3-4, ¶¶ 14-17.) Thus, because of the ambiguous language in the release, there is a genuine issue of material fact whether any suit arising from Coastal's single point designation is barred.

In addition, uncertainty as to the date of Coastal's single point designation precludes a finding of release as a matter of law. Under Florida law, it is "well-established" that a release barring claims that arise prior to the date of the agreement "will bar all claims which have matured

prior to executing the release." *Plumpton v. Cont'l Acreage Dev. Co., Inc.*, 830 So. 2d 208, 210

(Fla. 5th DCA 2002).  This rule "appears to hold true even when the mature claims are unrelated to

the litigation that resulted in the release." *Id.*  The record reveals inconsistencies as to the exact date

that Coastal was authorized to receive reimbursement for its tier three advertising as a single point

dealer.  (*Compare, e.g.*, Doc. No. 39-4 at 8 (arrangement began in early 1990s) *with* Doc. No. 85-3

at 3 (arrangement began in "approximately 1999").)  If this arrangement was agreed upon prior to

1999, then Plaintiff's claim regarding Coastal's single point designation would have matured prior

to the date of the agreement.  If the designation occurred after the date of the 1999 release, then the

claim would not have matured prior to the date of the agreement.  Thus, there is a general issue of

material fact whether Defendant's arrangement with Coastal occurred before or after June of 1999.

As a result, the Court cannot rule as a matter of law on the applicability of the 1999 release to

Plaintiff's claims involving the designation of Coastal as a single point dealer.

### b.      2002 Release

The 2002 release provides that Plaintiff releases Defendant from all claims "arising out of

or in connection with any prior agreements, business transactions, course of dealing, discussions[,]

or negotiations between the parties prior to the effective date hereof . . . ."  (Doc. No. 2 at 43.)

Plaintiff's claims are barred by this second release if they: (1) arise out of or are in connection with

any prior agreements, business transactions, course of dealing, discussions, or negotiations between

the parties (2) occurring prior to the date of the agreement.  (*Id.*)

The Eleventh Circuit Court of Appeals has interpreted nearly identical language barring suits

arising from or in connection with prior agreements as "terminat[ing] all prior written or oral

agreements which relate to the subject matter of the franchise." *Coral Gables Imported Motorcars,*

*Inc. v. Fiat Motors*, 673 F.2d 1234, 1238 (11th Cir. 1982); *see also First Class Coach & Equip., Inc. v. Thomas Built Buses, Inc.*, 209 F. App'x 922, 923 (11th Cir. 2006) ("Because plaintiff has not made a claim that the defendant has breached the territorial or other provisions of the 2003 agreement, and because plaintiff's claims all arise out of, or are in connection with, alleged violations of previous agreements, we conclude that the claims are barred by the release."). In other words, such a release prevents a party from suing under the obligations set forth in a prior contract or established by prior business dealings between the parties.

In this case, Plaintiff has brought claims for the breach of the *current* franchise agreement. (Doc. No. 2 at 4-10, ¶¶ 19-45.) Thus, Plaintiff is not asserting rights under a *prior* agreement, discussion, or negotiation and is not claiming that Defendant has breached a duty arising from a *prior* business transaction or course of dealing. Therefore, the unambiguous language of 2002 release clearly does not bar Plaintiff's claims, and the Court will address the remainder of Plaintiff's arguments as they relate to the 1999 release only.[5]

### 3. Public Policy

Plaintiff states that the 1999 release is unenforceable because it contravenes the legislative policy set forth in the DPA:

> It is the intent of the Legislature to protect the public health, safety, and welfare of the citizens of the state by regulating the licensing of motor vehicle dealers and

---

[5]     The Court therefore will not address Plaintiff's third and fifth arguments which are directed towards the 2002 release only. To the extent Plaintiff therein asserts that the application of the 1999 release to the continued harm suffered by Plaintiff caused by Coastal's designation as a single point dealer gives the release an improper prospective effect, such argument is rejected. (*See* Doc. No. 58 at 15.) The challenged conduct is the designation itself; therefore, Plaintiff's claim matured at the point that Defendant's "special arrangement" with Coastal began. *See Plumpton*, 830 So. 2d at 210.

manufacturers, maintaining competition, providing consumer protection and fair trade[,] and providing minorities with opportunities for full participation as motor vehicle dealers.

§ 320.605, Fla. Stat.  The Florida legislature, however, has set forth more specifically its policy concerning releases relating to motor vehicle dealerships in Section 320.64(20) of the Florida Statutes.  This provision prohibits, in a franchise agreement, the prospective release of claims concerning violations of the DPA.  *Id.* § 320.64(20).  As the Florida Supreme Court has explained, in interpreting Florida statutes, "a specific statute covering a particular subject area always controls over a statute covering the same and other subjects in more general terms."  *Stoletz v. State*, 875 So. 2d 572, 575 (Fla. 2004) (quoting *McKendry v. State*, 641 So. 2d 45, 46 (Fla. 1994)).  Because Section 320.64(20) is the more specific statute, it applies in lieu of Section 320.605.  The 1999 release does not apply prospectively and thus does not run afoul of Section 320.64(20).  Accordingly, the Court will not hold the release invalid as contrary to public policy.

Moreover, it has been a long-established rule in the Florida courts that "[i]t is only in clear cases that contracts will be held void as contrary to public policy as it is a matter of great public concern that freedom of contract be not lightly interfered with."  *Bituminous Cas. Corp. v. Williams*, 17 So. 2d 98, 101 (Fla. 1944).  As the Florida Supreme Court has explained:

> When a particular contract, transaction, or course of dealing is not prohibited under constitutional or statutory provision, or prior judicial decision, it should not be struck down on the ground that it is contrary to public policy, except it be clearly injurious to the public good or contravene some established interest of society. . . .  Courts, therefore, should be guided by the rule of extreme caution when called upon to declare transactions void as contrary to public policy and should refuse to strike down contracts involving private relationships on this ground, unless it be made clearly to appear that there has been some great prejudice to the dominant public interest sufficient to overthrow the fundamental public policy of the right to freedom of contract between parties *sui juris*.

*Id.* at 101-02.  Plaintiff has failed to make any showing of great prejudice to the dominant public interest.  Therefore, this Court heeds the warning of the Florida Supreme Court and declines to hold the 1999 release void as a matter of public policy.

### B.     Count III

Defendant next argues that its system of motor vehicle allocation is reasonable as a matter of law and therefore does not violate the DPA as Plaintiff has alleged in Count III.  (Doc. No. 39 at 9-11.)  The statutory provision at issue states a distributor violates the DPA if:

> The [distributor] has established a system of motor vehicle allocation or distribution or has implemented a system of allocation or distribution of motor vehicles to one or more of its franchised motor vehicle dealers which is unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the affected motor vehicle dealer or dealers.

§ 320.64(18), Fla. Stat.[6]  Plaintiff alleges that Defendant violated this provision by refunding the three percent advertising assessments collected from Coastal and Cocoa.  (Doc. No. 2 at 3-4, 8-9, ¶¶ 14-17, 34-37.)  Since the assessments were returned to Coastal and Cocoa, according to Plaintiff, these dealers effectively paid a lower price for new vehicles than did Plaintiff.  (*Id.*)  As Plaintiff explains:

> The effects of the Defendant's actions were . . . that the Plaintiff paid a higher amount, i.e. 3%, for vehicles purchased from the Defendants and, moreover, the Plaintiff suffered a competitive disadvantage with respect to Cocoa Hyundai and Coastal Hyundai due to the disparity in purchase price and advertising coverage between the Plaintiff and Cocoa Hyundai and Coastal Hyundai.  This disparity resulted in Cocoa Hyundai and Coastal Hyundai selling more vehicles and, thus, being allocated more vehicles by Hyundai.

(*Id.* at 4, ¶ 17.)

---

[6]     This provision in particular is substantially modified in the 2008 codification of the Florida Statutes.

In support its Motion, Defendant provides the deposition testimony of William A. Nero, the President and sole owner of Universal Hyundai, doing business as Action Nissan. (Doc. No. 2 at 14, 17; Doc. No. 39-4.) Nero was Plaintiff's corporate witness designated under Federal Rule of Civil Procedure 30(b)(6) to testify about, among other things, the allegations in Count III of the Complaint. (Doc. No. 39-6 at 3.) Nero testified that Defendant's system of allocation was called the "turn and earn system" which provided that "the more cars we sell, the more cars we get in our allocation . . . ." (Doc. No. 39-4 at 11.) He described this system as "common" amongst other manufacturers. (*Id.* at 11-12.) Nero further discussed Defendant's system of allocation as follows:

Q:      So if I understand you correctly, you are saying that it is not the system, it's that you were discriminatorily charged [more] on the price of the vehicle and that caused you to sell [less] vehicles and therefore get allocated less vehicles?

. . .

A:      That's correct.

Q:      With regard to whether or not the Hyundai allocation system is inequitable, would your answer be the same?

A:      Yes, it would be the same.

Q:      Would you say that the Hyundai allocation system is unreasonably discriminatory?

A:      No, I don't.

. . .

Q:      Is the HMA allocation system to the extent that you know not supported by reason or good cause?

A:      I believe it is.

Q:      Is the HMA allocation system generally speaking unfair?

A:      No, I don't think so.

(*Id.* at 17-18 (objections omitted).)  After citing this testimony from Nero, Defendant concludes:

> Here, it is undisputed that [Defendant]'s allocation system is premised on past sales and is common in the industry. . . .  As a matter of law, such an allocation system is reasonable. . . .  Moreover, the dealer principal of [Plaintiff] has admitted that there is no aspect of the allocation system that is unreasonable, discriminatory, or unsupported by good cause. . . .  And with no evidence that [Defendant's] allocation system is unreasonable, discriminatory, or unsupported by good cause, there can be no violation of Section 320.64(18), Florida Statutes.

(Doc. No. 39 at 11.)

In response, Plaintiff asserts that "Defendant totally mischaracterizes Plaintiff's claim and argues that it is based on [Defendant]'s system of *allocation*."  (Doc. No. 58 at 18 (emphasis added).)  Plaintiff instead asserts that it has "set forth a claim that [Defendant]'s system of *distribution* violates [the DPA]."  (*Id.* (emphasis added).)  Plaintiff then argues that the DPA contemplates two different things when it describes "a system of allocation or distribution."  (*Id.* at 18-21.)  According to Plaintiff, this interpretation is consistent with the industry practice that "the allocation system and the distribution system are separate and distinct elements of the manufacturer/distributor relationship with dealers."  (*Id.* at 19.)  Plaintiff then states:

> Mr. Nero indicates that an allocation system which has an element in it based upon past sales or "turn and earn" may be fine but states, it is the separate distribution of the vehicles regarding which the manufacturer/distributor's price to the dealer is the key element, that is the unfair, inequitable and unreasonable discriminatory conduct at issue in the instant case.

(*Id.* at 20.)  Finally, Plaintiff concludes, "Since Defendant has failed, in any regard, to address [Plaintiff's] claim regarding Defendant's distribution system, Defendant's Motion for Summary Judgment [on Count III] should be denied."  (*Id.*)

Though the Complaint does not clearly distinguish Plaintiff's claims based on Defendant's system of allocation from its claims based on Defendant's system of distribution, the Complaint does quote the relevant statutory provision and outline the pertinent facts.  (Doc. No. 2 at 3-4, 8-9, ¶¶ 14-17, 34-37.)  In its factual recitation, Plaintiff uses variations of both "allocate" and "distribute."  (*Id.*) These allegations are sufficient to meet the "short and plain statement" standard in Federal Rule of Civil Procedure 8(a)(2) and are detailed enough to give Defendant adequate notice of Plaintiff's claims.  While Plaintiff appears to concede that Defendant's system of allocation does not violate the DPA, the Court declines to grant summary judgment on Count III because Defendant does not in its first Motion for Summary Judgment address Plaintiff's claims concerning Defendant's system of distribution.

### C.    Count IV

In Count IV of the Complaint, Plaintiff alleges that Defendant breached its fiduciary duty to Plaintiff by misusing the advertising assessments collected from Plaintiff.  (Doc. No. 2 at 9-10, ¶¶ 38-45.)  Defendant moves for summary judgment on this claim, arguing that it is barred by Florida's economic loss rule.  (Doc. No. 39 at 11-13.)  Plaintiff responds that the claim of breach of fiduciary duty is an independent tort which is not barred by the economic loss rule.  (Doc. No. 58 at 21-25.)

According to the Florida Supreme Court, "The economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses."  *Indemnity Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 536 (Fla. 2004).  Economic losses are "disappointed economic expectations," or more broadly "the loss of the benefit of the bargain."  *Id.* at n.1.  The rule applies in two different circumstances: (1)

"when the parties are in contractual privity and one party seeks to recover damages in tort for matters arising from the contract," and (2) "when there is a defect in a product that causes damage to the product but causes no personal injury or damage to other property." *Id.* at 536.

The purpose of the contractual privity economic loss rule is "to prevent parties to a contract from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort."[7]  *Id.*  Accordingly, "courts have held that a tort action is barred where a defendant has not committed a breach of duty apart from a breach of contract." *Id.* at 537.  A tort action is not barred, however, when the tort is "committed independently of the contract breach." *Id.*  If a tort requires proof of facts "separate and distinct from the breach of contract," then the tort is independent.  *Id.* (quoting *HTP, Ltd. v. Lineas Aereas Constarricenses, S.A.*, 685 So.2d 1238, 1239 (Fla. 1996)).

Florida courts have recognized a tort cause of action for breach of fiduciary duty.  *Doe v. Evans*, 814 So.2d 370, 374 (Fla. 2002).  A fiduciary relationship may be implied by law and exists between two persons when "one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation."  *Id.* (quoting Restatement (Second) of

---

[7]      The Florida Supreme Court further explained:

> Underlying this rule is the assumption that the parties to a contract have allocated the economic risks of nonperformance through the bargaining process. A party to a contract who attempts to circumvent the contractual agreement by making a claim for economic loss in tort is, in effect, seeking to obtain a better bargain than originally made. Thus, when the parties are in privity, contract principles are generally more appropriate for determining remedies for consequential damages that the parties have, or could have, addressed through their contractual agreement.

*Indemnity Ins. Co. of N. Am.*, 891 So.2d at 536-37.

Torts § 874 cmt. a).  "If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief." *Id.* (quoting *Quinn v. Phipps*, 113 So. 419, 421 (Fla. 1927)).  While the economic loss rule does not automatically bar a breach of fiduciary duty claim, the rule does apply when the claim for breach of fiduciary duty is based upon and inextricably intertwined with the claim for breach of contract.  *Royal Surplus Ins. Co. v. Coachman Indus., Inc.*, 184 F. App'x 894, 902 (11th Cir. 2006); *Granat v. Axa Equitable Life Ins. Co.*, No. 06-civ-21197, 2006 WL 3826785, at *3-5 (S.D. Fla. Dec. 27, 2006); *Detwiler v. Bank of Cent. Fla.*, 736 So.2d 757, 759 (Fla. 5th DCA 1999).

In the instant case, Plaintiff and Defendant were in contractual privity.  (Doc. No. 2 at 12-46.)  Defendant collected an advertising assessment from Plaintiff pursuant to the following provision:

> The Hyundai Dealer Advertising Association will finance its advertising programs through the assessment of a fixed amount for each new Hyundal Motor Vehicle purchased by Hyundai Dealers.  As a service to the Dealer Association, [Defendant] will collect the agreed amount, provided that the Association maintains control over the amount of the assessment and the manner in which the funds are expended and so long as such funds are expended for the promotion of Hyundai Products which may also include Parts and Service advertising campaigns from time to time.

(*Id.* at 24.)  Defendant argues that the economic loss rule applies because Plaintiff's breach of fiduciary duty claim is inherently intertwined with Plaintiff's claim of breach of contract.  (Doc. No. 39 at 12-13.)  Plaintiff responds that when Defendant "was entrusted with and assumed responsibility for[] the use and management of the Plaintiff's cooperative advertising association funds and those of other unsuspecting dealers," Defendant took on a fiduciary obligation that was independent of the contract.  (Doc. No. 2 at 9, ¶ 40; Doc. No. 58 at 24.)  According to Plaintiff,

Defendant also "converted the Plaintiff's cooperative advertising funds entrusted to it for its own use." (Doc. No. 58 at 24.) Therefore, Plaintiff argues that the breach of fiduciary claim is independent of the breach of contract claim, and the economic loss rule does not apply. (*Id.*)

Though the case law describing the line between torts independent of the contract and those intertwined with the contract is not entirely clear, this case falls on the side of the contractually intertwined torts. The fiduciary duty alleged by Plaintiff arises from Defendant's purported contractual obligation to collect advertising assessments. (*See* Doc. No. 2 at 9-10, ¶¶ 38-45.) Plaintiff has not alleged or offered evidence of any independent special relationship between the parties that caused Plaintiff to entrust Defendant with this money; the duty is established entirely by the contract.[8] Plaintiff's allegation that Defendant breached its fiduciary duty by unlawfully converting the funds does not make this tort independent because the duty upon which the claim is based arises from the contractual relationship. Under Florida law, whatever duty Defendant has to Plaintiff concerning these collected assessments is defined by the contract rather than an independent fiduciary duty. *See, e.g.*, *N. Am. Clearing, Inc. v. Brokerage Computer Sys., Inc.*, No. 6:07-cv-1503-Orl-19KRS, 2008 WL 341309, at *4 (M.D. Fla. Feb. 5, 2008) (dismissing breach of fiduciary duty claim as inextricably intertwined with breach of contract claim pursuant to Florida's

---

[8]     There are cases in which Florida courts have found fiduciary duties independent of the contractual obligations between the parties. *See, e.g.*, *Moransais v. Heathman*, 744 So. 2d 973, 983 (Fla. 1999) (professional obligation of a service professional to a consumer is independent of contractual relationship); *First Equity Corp. of Fla., Inc. v. Watkins*, Nos. 98-851, 98-589, 1999 WL 542639, at *1 (Fla. 3d DCA July 28, 1999) (per curiam) (independent fiduciary duty arises from the purchase and sale of securities); *Greenfield v. Manor Care, Inc.*, 705 So. 2d 926, (Fla. 4th DCA 1997) (special relationship that developed between nursing home care providers and their residents created an independent fiduciary duty), *abrogated on other grounds by Beverly Enter. Fla., Inc. v. Knowles*, 766 So.2d 335, 336 (Fla. 4th DCA 2000).

economic loss rule); *Travelers Indem. Co. of Ill. v. Royal Oak Enters., Inc.*, 429 F. Supp. 2d 1265, 1273 (M.D. Fla. 2004) (same); *Royal Surplus Lines Ins. Co. v. Coachman Indus., Inc.*, No. 3:01-cv-301-J-HTS, 2002 WL 32894915, at *22-23 (M.D. Fla. Sept. 17, 2002) (same).  Moreover, Defendant's only contractual obligation concerning these funds was to transfer the advertising assessments to the appropriate HDAA, and Plaintiff has not claimed that Defendant failed to properly transfer Plaintiff's assessments.

In its proposed Amended Complaint, Plaintiff raised a different theory concerning the breach of fiduciary duty claim.  (Doc. No. 42-2.)  There, Plaintiff alleged that Defendant was in effect the alter ego of the HDAAs and assumed the fiduciary obligations of the HDAAs.  (Doc. No. 42-2 at 5, 11-12, ¶¶ 13, 43-35.)  However, the HDAA to which Plaintiff belonged, the SRAG, was never named as a party to this lawsuit.  Furthermore, Plaintiff's Motion to Amend the Complaint was denied, and Plaintiff has not provided argument or citation to the record to support this theory in any subsequent filings.  Thus, Plaintiff appears to have abandoned its efforts to pierce the corporate veil of the SRAG.  Accordingly, this Court declines to consider further the merits of Plaintiff's alter ego/agency theory of fiduciary duty.

Because Plaintiff has failed to demonstrate a fiduciary duty independent of Defendant's contractual obligations, Plaintiff's claim for breach of fiduciary duty is barred by the economic loss rule.  Therefore, the Motion for Summary Judgment on Count IV of the Complaint must be granted.

## II.    Defendant's Second Motion for Summary Judgment (Doc. No. 101)

### A.    Arguments Properly Before the Court

On March 27, 2008, Defendant moved for leave to file a second Motion for Summary Judgment.  (Doc. No. 52.)  In this Motion, Defendant explained: "On February 28, 2008,

[Defendant] filed a summary judgment motion on three legal issues. . . . [Defendant] intends to file a second summary judgment motion at the close of discovery to address the merits of [Plaintiff]'s remaining claims based on the evidence obtained in discovery." (*Id.* at 1.)  Defendant further stated that the second motion would "focus on factual issues."  (*Id.* at 2.)  The Court granted this Motion on March 27, 2008.  (Doc. No. 53.)

After Defendant filed its second Motion for Summary Judgment, Plaintiff argued that Section IV of the Motion should be stricken because it constitutes an impermissible reply to Plaintiff's Response to Defendant's first Motion for Summary Judgment.  (Doc. No. 96 at 5-7, ¶¶ 14-22.)  The Court did not consider the arguments in Defendant's second Motion for Summary Judgment in ruling on Defendant's first Motion for Summary Judgment; therefore, Plaintiff's request to strike Section IV is denied as moot.

Plaintiff also argues that Section V is improper because it is merely a continuation of Defendant's arguments in its first Motion concerning the breach of fiduciary duty claim.  (*Id.* at 7-8, ¶¶ 23-24.)  Plaintiff claims that this exceeds the scope of the Court's leave.  (*Id.*)  In Section V, however, Defendant does not merely reiterate the economic loss rule argument that it made in its first Motion.  (*Compare* Doc. No. 39 at 11-13 *with* Doc. No. 101 at 18-20.)  Rather, Defendant provides argument whether Defendant is Plaintiff's fiduciary and, if so, whether Defendant violated this duty.  (Doc. No. 101 at 18-20.)  This is consistent with Defendant's statement in its Motion for leave to file that the second Motion would "focus on factual issues."  (Doc. No. 52 at 2.)  In any event, the Court has already granted summary judgment on Plaintiff's breach of fiduciary duty claim, and so Plaintiff's request to strike Section V on this basis is also denied as moot.

### B.     Merits of Motion

Defendant asserts that summary judgment on Counts I, II, and III is appropriate for the following reasons: the designation of Coastal and Cocoa as single point dealers does not violate any express term of the franchise agreement, Plaintiff has not established damages flowing from the purported breach of the franchise agreement, and Plaintiff has offered no evidence that Defendant's allocation and/or distribution system is unfair, inequitable, or otherwise violates Section 320.64(18) of the Florida Statutes.  (Doc. No. 101 at 2.)  The Court considers the merits of these arguments below.

### 1.     Count I

Defendant argues that summary judgment on Count I should be granted because Plaintiff has failed either to demonstrate breach of an express term of the contract or to establish damages flowing from this breach.  (*Id.* at 3-6, 8-12.)  Plaintiff responds that it has identified breaches of four contractual provisions and has provided competent evidence of damages flowing from these breaches.  (Doc. No. 105 at 5-9, 11-16, ¶¶ 6-13, 20-31.)

In Florida, "It is elementary that in order to recover on a claim for breach of contract the burden is upon the claimant to prove by a preponderance of the evidence the existence of a contract, a breach thereof[,] and damages flowing from the breach."  *Knowles v. C.I.T. Corp.*, 346 So. 2d 1042, 1043 (Fla. 1st DCA 1977) (per curiam).  As long established by the Florida Supreme Court, "What will constitute a breach of contract is a matter of law to be determined by the court.  Whether or not that has occurred which would constitute a breach of contract is a matter of fact to be determined by a jury."  *Winter Garden Citrus Growers' Ass'n v. Willits*, 151 So. 509, 511 (Fla. 1933).

The first provision that Plaintiff contends was breached is section 10(A)(1) of the franchise agreement which provides in relevant part: "[Defendant] agrees to provide [Plaintiff] with an explanation of the method used to distribute [Hyundai] products and, upon written request, will advise [Plaintiff] of total sales by model to all Dealers collectively in the Region and to [Plaintiff] individually."  (Doc. No. 2 at 22.)  Plaintiff explains:

> Distribution includes delivery of the vehicles and payment of the price for such vehicles. The manufacturer's price to the dealer is a key element of the distribution system. . . . [Defendant] chose not to apply the same distribution method for each Hyundai dealer, refunding the advertising assessment to Coastal and Cocoa and failed to explain this deviation from the stated method of distribution to Plaintiff, thereby breaching Defendant's obligation.

(Doc. No. 105 at 6, ¶ 7.)

Plaintiff here asserts that Defendant failed to explain the method it used to distribute Hyundai products.  The record shows that in order for Defendant to distribute vehicles, dealers had to pay, in addition to the basic vehicle price, a three percent advertising assessment.  (*E.g.*, Doc. No. 105-8 at 2, ¶¶ 5-6.)  However, Coastal and Cocoa were refunded their three percent assessment for Tier Three advertising.  (*E.g.*, Doc. No. 101-8 at 3-5.)  William Nero, Plaintiff's owner and operator, stated in his affidavit that Defendant never informed Plaintiff of this refund arrangement.  (Doc. No. 105-8 at 3-4, ¶ 12.)  Nero explained that Coastal and Cocoa were in effect not paying the three percent assessment; therefore, they were paying three percent less for their vehicles than Plaintiff.  (*Id.* at 4, ¶ 13.)  Because there is evidence in the record that this arrangement for the advertizing fee related to the price of the vehicles that Defendant offered its dealers, for the purposes of a summary judgment motion the Court must consider that it was part of Defendant's method of distribution.  (*Id.*)  Accordingly, Nero's statement raises a genuine issue of material fact whether Defendant breached Section 10(A)(1) of the franchise agreement.

Plaintiff has also raised a genuine issue of material fact that it suffered damages as a result of Defendant's alleged breach.  Nero asserted in his sworn statement, "As a result of the 'backroom deal' [Defendant] effectively charged different prices to different dealers." (*Id.*)  He further testified that, because he was unaware of Defendant's arrangement with Coastal and Cocoa, he was placed at a "competitive disadvantage," resulting in lost sales and lost profits.  (*Id.* at 4-5, ¶¶ 15-16.)  Once Nero became aware of the practice, he complained to Defendant which ceased providing the reimbursements to Coastal and Cocoa.  (Doc. Nos. 105-3, 105-4.)  Had Plaintiff been informed of the reimbursements at the onset of the franchise relationship, Plaintiff could have raised the issue with Defendant earlier and avoided its losses.  Thus, Plaintiff has raised a genuine issue of material fact that Defendant breached Section 10(A)(1) of the franchise agreement and caused Plaintiff to suffer damages.

Next, Plaintiff claims a breach of Section 10(A)(2) which states:

> [Defendant] reserves the right, without prior notice to [Plaintiff], to establish and revise prices and other terms of sale for all Hyundai Products sold to [Plaintiff] under this Agreement.  [Defendant], however, will provide notice to [Plaintiff] of any revision in prices and other terms of sale before shipping any Hyundai Product subject to such revision.

(Doc. No. 2 at 22.)  Plaintiff attempts to explain how the advertising assessment refund to Coastal and Cocoa may be viewed as a change in its terms of sale or a revision in its prices as follows:

> One of the "terms of sale[,]" including pricing, was that [Defendant] would agree to assist Hyundai dealers in the establishment of a cooperative advertising association and collecting an advertising assessment from each Hyundai dealer.  Hyundai returned all of Cocoa's and Coastal's advertising assessments back to them effectively charging different prices to different dealers and altering the terms of sale.  These actions by Defendant revised the prices and other terms of sale relating to [Plaintiff], as well as other Hyundai dealers and paragraph 10(A)(2), at a minimum, required [Defendant] to fully notice and disclose these changes and actions to Plaintiff and other Hyundai dealers.  It did not advise Plaintiff. . . .  Thus, the record

provides evidence that [Defendant] breached paragraph 10(A)(2) and Hyundai's Motion for Summary Judgment on this issue should be denied.

(Doc. No. 105 at 7, ¶ 9.)  The Court finds these arguments unpersuasive.  Plaintiff claims that the prices Defendant *charged Plaintiff* per vehicle somehow changed because Defendant was effectively charging lower prices *to other dealers*.  However, this provision of the contract does not require Defendant to explain changes in the relative sale prices paid by other dealers; rather, the contract requires Defendant to notify Plaintiff of any changes to the prices of the vehicles that *Plaintiff* purchases.  Plaintiff has neither alleged nor offered evidence of any such changes to the price of the vehicles it purchased or its terms of sale.  As explained by Defendant:

> Universal cannot point to any evidence that HMA failed to notify Universal of any revision in prices of Hyundai Products sold to Universal before shipping those products.  At best, Universal asserts that the designation of Coastal and Cocoa as single-point dealers allowed them "effectively" to receive Hyundai Products at a lower price and for Universal "effectively" to pay for those products at a higher price.  This, however, is not a violation of Paragraph 10.A.2.  Universal was at all times aware of the prices it was in fact charged for Hyundai Products regardless of whether Coastal or Cocoa allegedly "effectively" received those products at lower prices and regardless of whether Universal now believes, in hindsight, that the prices charged were too high.

(Doc. No. 101 at 4-5.)  The Court finds that Defendant's arguments are well taken and concludes that the actions alleged by Plaintiff do not constitute a breach of this provision.

Next, Plaintiff asserts that Section 10(B)(3) was violated by Defendant.  This Section begins:

> [Defendant] and [Plaintiff] recognize the benefits which may be derived from a comprehensive joint advertising effort by Hyundai Dealers.  Accordingly, [Defendant] agrees to assist Hyundai Dealers, including [Plaintiff], in the establishment of a cooperative advertising association.  [Plaintiff] agrees to cooperate with [Defendant] in the formation of such association and, once it is established, to participate actively and to contribute to it in accordance with the by-laws of the association.

(Doc. No. 2 at 23-24.)  Plaintiff believes that the statement of purpose "to recognize the benefits which may be derived from a comprehensive joint advertising effort" imposes on Defendant "the contractual obligation of assisting Hyundai dealers to recognize the benefits from the comprehensive joint advertising effort . . . ."  (Doc. No. 105 at 7, ¶ 10.)  However, this language of general purpose cannot reasonably be interpreted to create a duty to perform, and Plaintiff's arguments to the contrary are not persuasive.

Section 10(B)(3) continues:

> The Hyundai Dealer Advertising Association will finance its advertising programs through the assessment of a fixed amount for each new Hyundai Motor Vehicle purchased by Hyundai Dealers.  As a service to the Dealer Association, [Defendant] will collect the agreed amount, provided that the Association maintains control over the amount of the assessment and the manner in which the funds are expended and so long as such funds are expended for the promotion of Hyundai Products which may also include Parts and Service advertising campaigns from time to time.

(*Id.* at 24.)  In explaining how Defendant has breached this portion of the contract, Plaintiff argues:

> [Defendant] further takes on the contractual obligation to collect the agreed advertising assessment. [Defendant] breached its obligations under paragraph 10(B)(3), when [Defendant] unilaterally agreed to the refund of Coastal's and Cocoa's advertising assessments, thereby effectively not collecting the advertising assessments from Coastal and Cocoa and failing to establish the comprehensive joint advertising effort.  HMA let two dealers out of the obligation to join the Orlando cooperative advertising association even though HMA's policies required them to contribute.  These actions by Hyundai breached paragraph 10(B)(3).

(*Id.* at 7-8, ¶ 10.)  Notably, Plaintiff does not contend that Defendant failed to actually collect the advertising assessments from Coastal or Cocoa, nor does Plaintiff claim that these dealerships used the assessments for anything other than advertising.  (Doc. No. 101-4 at 9; Doc. No. 105-8 at 4, ¶ 15; Doc. No. 105-13 at 15; Doc. No. 105-15 at 4.)  Furthermore, in this provision, Defendant does not obligate itself *to Plaintiff*; instead, Defendant agrees to provide a service to a third party, the SRAG, which by the terms of this provision was to retain the right to determine the amount of the

assessment and its proper expenditure to advertize Hyundai products.  There is no record evidence

that the SRAG has brought suit directly or as a third party beneficiary for Defendant's failure to turn

over Coastal and Cocoa's advertising assessments to it, and there is no record evidence that Plaintiff

has sued the SRAG for breach of an obligation to Plaintiff or brought suit as a third party beneficiary

of any agreement between the SRAG and Defendant.  Rather, Plaintiff attempts to bring a claim

solely under this contract between it and Defendant, and the plain language of Section 10(B)(3) does

not grant Plaintiff any enforceable rights in this regard.

Lastly, Plaintiff claims that Defendant breached Section 10(D)(2) which states:

> In order that authorized Hyundai Dealers may be assured of the benefits of
> comprehensive advertising and promotion of Hyundai Products, [Defendant] agrees
> to establish and maintain general advertising and promotion programs and will from
> time to time make sales promotion and campaign materials available to [Plaintiff] to
> promote the sale of such Hyundai Products at a reasonable charge where applicable.
> [Plaintiff] agrees to cooperate in [Defendant]'s advertising programs and to fully
> utilize the materials offered [Plaintiff] by [Dealer].

(Doc. No. 2 at 25.)  To support its claim of breach under this provision, Plaintiff merely states,

"Plaintiff has set forth evidence in the record that [Defendant]'s compliance with this contractual

provision diminished and has been breached."  (Doc. No. 105 at 8, ¶12.)  Plaintiff cites to the

deposition testimony of Harold Philipson to support this contention.  (Doc. No. 105-20.)  In his

deposition, Mr. Philipson explains that Defendant made contributions to the HDAAs in an amount

that declined over the years.  (*Id.* at 2-3.)  He does not, however, discuss how this relates to

Defendant's promotion programs or campaigns.  (*Id.*)  Defendant has offered undisputed evidence

that it made reasonable efforts to establish and maintain general advertising and promotion

programs.  (Doc. No. 101-10 at 1-2, ¶ 2.)  On the other hand,  Plaintiff has not provided any

evidence showing that Defendant breached an obligation to contribute certain amounts to the

HDAAs.  Thus, Plaintiff, which bears the burden of proof on this issue, has not shown how Defendant's diminishing HDAA contribution may be deemed a breach of this contractual provision.

Because Plaintiff has raised a genuine issue of material fact that Defendant breached Section 10(A)(1) of the franchise agreement, the Court must not grant summary judgment on Count I.

## 2.    Count II

Under Florida law, the implied covenant of good faith and fair dealing is a part of every contract.  *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001).  Rather than serving as an independent term within a contract, however, the covenant attaches to the performance of a specific contractual obligation.  *Id.*  As explained by the Eleventh Circuit:

> [N]o independent cause of action exists under Florida law for breach of the implied covenant of good faith and fair dealing.  Where a party to a contract has in good faith performed the express terms of the contract, an action for breach of the implied covenant of good faith will not lie.  More specifically, a cause of action for breach of the implied covenant cannot be maintained (a) in derogation of the express terms of the underlying contract or (b) in the absence of breach of an express term of the underlying contract.

*Burger King Corp. v. Weaver*, 169 F.3d 1310, 1317-18 (11th Cir. 1999).[9]

Plaintiff has asserted a claim of breach of the implied covenant of good faith and fair dealing as an independent cause of action.  (Doc. No. 2 at 6-7, ¶¶ 25-30.)  Because the Eleventh Circuit has clearly held that no such independent cause of action exists, and Plaintiff does not assert the implied covenant as part of its breach of contract claim, the Court must grant Defendant's Motion for Summary Judgment on Count II of the Complaint.

---

[9]    The covenant appears to remain viable as a legal theory only in contracts in which one party is afforded the authority to act in a purely discretionary manner.  *See Ernie Haire Ford, Inc.*, 260 F.3d at 1290-92 (citing cases).  In such cases, a party may breach the contract by failing to exercise its discretion in good faith.  *See id.*

### 3.    Count III

As previously explained, Count III alleges a violation of the provision of the DPA that prohibits a distributor from establishing or implementing a "system of motor vehicle allocation or distribution" which is "unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the affected motor vehicle dealer or dealers." 320.64(18), Fla. Stat.  Defendant argues for summary judgment on this claim because: (1) Plaintiff failed to adequately plead a claim of an unlawful system of *distribution*, (2) the statute does not distinguish between "allocation" and "distribution," (3) Plaintiff has failed to demonstrate that Defendant's system of allocation and/or distribution is unfair, and (4) there is no evidence that Plaintiff suffered any damages as a result of this alleged violation.  (Doc. No. 101 at 13-17.) Plaintiff counters each of Defendant's arguments.  (Doc. No. 105 at 16-27.)

The Court has already addressed Defendant's first argument in Section I.B, *supra*, and found that Plaintiff adequately stated a claim regarding an unlawful system of distribution in its Complaint.

Defendant's second argument also lacks merit.  The relevant statute addresses a "system of motor vehicle allocation *or* distribution." § 320.64(18), Fla. Stat. (emphasis added).  The statute does not define these terms, and the Court was unable to locate a case in which a court considered whether there was a difference between the words "allocation" and "distribution" in this provision. However, the legislature's use of the disjunctive "or" indicates its intent to regulate two separate concepts.  As the United States Supreme Court has explained, "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates

otherwise . . . ."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).  Therefore, this Court must consider whether the context of the statute suggests that "allocation" and "distribution" mean the same thing.

In a sworn affidavit, Plaintiff's owner and operator, William Nero, stated, "In the automobile industry, the allocation system and the distribution system are separate and distinct elements of the manufacturer/distributor relationship with the dealers."  (Doc. No. 105-8 at 3, ¶ 9.)  He continued, "A system of allocation in the automotive industry is a system which determines how many vehicles a manufacturer/distributor will offer a dealer or how many vehicles a dealer is entitled to receive from the manufacturer."  (*Id.* ¶ 10.)  On the other hand, he explained, "The manufacturer's price to the dealer is a key element of the distribution system."  (*Id.* ¶ 11.)  As Plaintiff has further stated, "A system of distribution as referenced in F.S. §320.64(18) is the system by which a manufacturer/distributor delivers vehicles to the dealers and is paid for its vehicles."  (Doc. No. 105 at 20, ¶ 41.)

Defendant counters that "allocation" and "distribution" are synonyms and should be interpreted to mean the same thing.  (Doc. No. 101 at 15.)  To support this argument, Defendant has offered the testimony of one of Plaintiff's employees who stated that he understood "allocation system" and "distribution system" to mean the same thing.  (Doc. No. 101-7 at 4-5.)

Defendant has not demonstrated that the statutory context dictates departure from the canon of statutory construction that a court should give independent meaning to each word used in a statute, particularly when words are separated by "or."   *Reiter*, 442 U.S. at 339.  As the Florida Supreme Court has stated, "We are required to give effect to 'every word, phrase, sentence, and part of the statute, if possible, and words in a statute should not be construed as mere surplusage.'" *Heart*

*of Adoptions, Inc. v. J.A.*, 963 So. 2d 189, 198 (Fla. 2007) (quoting *Am. Home Assurance Co. v. Plaza Materials Corp.*, 908 So. 2d 360, 366 (Fla. 2005)). Though one of Plaintiff's employees was unaware of the distinction between "distribution" and "allocation," this does not constitute evidence that the legislature did not intend to distinguish between the two words. Defendant has failed to offer convincing statutory analysis to rebut Plaintiff's interpretation, and the Court finds that the distinction articulated by Plaintiff is consistent with the statutory language and legislative purpose underlying the statute. Accordingly, the Court concludes that the DPA distinguishes between a system of allocation and a system of distribution.

Defendant next argues that Plaintiff is unable to demonstrate unfairness or inequity in Defendant's system of allocation or distribution. Instead, according to Defendant, "[w]hat [Plaintiff] is challenging is the fact that, in a separate event, Cocoa and Coastal's advertising assessments were returned to Cocoa and Coastal as reimbursement for their advertising costs." (Doc. No. 101 at 16.) Thus, "[Plaintiff] attempts to shoehorn its allegations regarding advertising assessments into a distribution system claim under section 320.64(18), Florida Statutes . . . ." (*Id.* at 16-17.) Here, Defendant is essentially arguing that Plaintiff's claim fails as a matter of statutory interpretation because the term "system of distribution" in the DPA may not fairly be interpreted to include a distributor's reimbursement of advertising assessments. Defendant explains:

> Under [Plaintiff]'s reading of the statute, anything which has an impact on the sale of a vehicle would come within the ambit of Section 320.64(18). (Dkt. No. 58, p. 20.) Nothing within Section 320.64(18) indicates such a broad intent, and the statute cannot fairly be read as seeking to regulate the pricing or other aspects of the sale of a motor vehicle. Moreover, Chapter 320 contains other provisions which, under [Plaintiff]'s reading of Section 320.64(18), would be rendered superfluous. *See, e.g.*, Fla. Stat. § 320.64(22) (barring charging "extra fee" for specific line-makes).

(*Id.* at 14-15.)

Plaintiff argues in response:

> A system of distribution as referenced in Florida Statute §320.64(18) is the system by which a manufacturer/distributor delivers vehicles to the dealers and is paid for its vehicle[s].  The manufacturer's price to the dealer is a key element of distribution systems.  (See Nero Affidavit)  The evidence, including Hyundai's Franchise Agreement language, and common sense, indicates that the purchase and delivery of motor vehicles are part of the distribution system.  An element of the purchase is the price.  Obviously, you cannot have a purchase without a price and until a price is determined and paid, Hyundai will not sell a vehicle to the dealer and the system of distribution is not complete.  (See Nero Affidavit, Exhibit 6.)

(Doc. No. 105 at 22, ¶ 47.)  In other words, Plaintiff reasons that: (1) the advertising assessments are included as part of the price of vehicles purchased from Defendant, (2) the advertising assessments are returned to some dealers and not others, therefore (3) the dealers whose assessments are not returned (Plaintiff) pay a higher price per vehicle than those dealers whose assessments are returned (Coastal and Cocoa).  (*See* Doc. No. 105-8 at 3-4, ¶¶ 11, 13, 15.)  Since price is part of the system of distribution, and the advertising assessment refund arrangement affects the price of the vehicles, the refund arrangement is part of Defendant's system of distribution, according to Plaintiff. (*See id.*)

The Court first addresses Defendant's claim that Plaintiff's interpretation of Section 320.64(18) would render Section 320.64(22) superfluous.   Section 320.64(22) prohibits the following acts:

> The [distributor] has refused to deliver, in reasonable quantities and within a reasonable time, to any duly licensed motor vehicle dealer who has an agreement with such [distributor] for the retail sale of new motor vehicles . . . sold or distributed by the [distributor], any such motor vehicles . . . as are covered by such agreement. Such refusal includes . . . requiring a dealer to pay any extra fee . . . .

§ 320.64(22), Fla. Stat.  Defendant's argument is not well taken.  Plaintiff is not bringing a claim under Section 320.64(18) for Defendant's refusal to deliver vehicles; rather, Plaintiff is claiming

Defendant violated Section 320.64(18) by permitting price disparities in its system of distribution. Thus, under Plaintiff's interpretation, Section 320.64(18) governs conduct distinct from that described in Section 320.64(22).

The exact conduct included in the term "system of distribution" in Section 320.64(18) appears to be a matter of first impression, and the Court must look to the language and purpose of the statute for guidance. To begin, the DPA is a remedial statute and therefore should be construed broadly. *Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of N. Am.*, 32 F.3d 528, 534 (11th Cir. 1994) ("Because [Florida's] Dealer Protection Act is remedial in nature and designed to promote the public good, its provisions should be interpreted broadly to effectuate its purpose."). The language of the provision at issue instructs the Court to consider the equities of dealers affected and decide whether the system of distribution is "unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause . . . ." § 320.64(18), Fla. Stat. This broad language suggests that the statute was intended to cover a wide range of conduct.

The legislative purpose behind the statute also supports a liberal interpretation of its language. The DPA was "enacted to facilitate the legislative intent of ensuring fair dealing between motor vehicle manufacturers, motor vehicle dealers, and motor vehicle consumers." *Dick Winning Chrysler-Plymouth of Ft. Meyers, Inc. v. Chrysler Motor Corp.*, 750 F.2d 895, 898 (11th Cir. 1985). Such a far-reaching policy supports the broader statutory interpretation advocated by Plaintiff rather than the narrow interpretation offered by Defendant. Therefore, the Court concludes that the statutory language and legislative purpose of the DPA supports an interpretation of "system of distribution" in Section 320.64(18) to include a distributor's creation of price disparities through advertising assessment refunds as alleged by Plaintiff.

Next, Defendant argues that Plaintiff has offered no evidence showing unfairness or inequity in Defendant's system of allocation or distribution.  Plaintiff responds that it has produced such evidence.  First, Plaintiff has provided Defendant's own admissions that Defendant designated Coastal and Cocoa as submarkets rather than the SRAG.  (Doc. No. 105-5 at 5; Doc. No. 105-9 at 2.)  In a 2005 Settlement Agreement between Defendant, Coastal, Cocoa, which was signed by the Ed Bradley, the Vice President of Sales, for Defendant, the following facts are set forth:

> Whereas, in approximately 1999, Coastal Hyundai and [Defendant] agreed that, rather than paying the advertising funds resulting from [Defendant]'s sale of its vehicles to SRAG, for use in purchasing advertising which would be seen throughout the entire Orlando ADI/DMA, [Defendant] would hold these funds and reimburse Coastal Hyundai for advertising that it would undertake and which would be targeted at Brevard County customers, and

> Whereas, [Defendant] agreed to this request and since that time, has reimbursed Coastal Hyundai, for these expenditures, rather than paying these funds to SRAG, and

> Whereas, Cocoa Hyundai, since its opening in 2000, has been reimbursed by HMA in the same manner as Coastal Hyundai, as described in the preceding clause, . . . .

(Doc. No. 105-9 at 2.)  This evidence suggests that it was not the SRAG that independently reimbursed Coastal and Cocoa but rather Defendant that arranged for the reimbursement and held the accrued assessments of these dealers for reimbursement.  Therefore, Plaintiff has raised a genuine issue of material fact whether the reimbursement may fairly be attributed to Defendant's system of distribution rather than the separate actions of an independent entity, the SRAG.

Plaintiff has also provided evidence that this arrangement made Defendant's system of distribution of motor vehicles unfair and inequitable.  For example, Plaintiff has offered the affidavit of Mr. Nero, who stated under oath that "[t]he manufacturer's price to the dealer is a key element of the distribution system."  (Doc. No. 105-8 at 3, ¶ 11.)  He further explained:

-36-

> As a result of the "backroom deal" [between Defendant, Coastal, and Cocoa,] [Defendant] effectively charged different prices to different dealers. More specifically, Cocoa Hyundai and Coastal Hyundai were charged up to $500.00 less per vehicle (the amount equal to the 3% advertising assessment that Universal Hyundai was required to pay) than that charged to Universal Hyundai for the same vehicles. . . .
>
> * * *
>
> By returning the advertising fees to Cocoa Hyundai and Coastal Hyundai with the understanding that Cocoa Hyundai and Coastal Hyundai must use such funds for advertising their respective dealerships (tier three advertising) the Defendant effectively subsidized Cocoa Hyundai and Coastal Hyundai's advertising which subsidization was never offered and in fact not available to Universal Hyundai. These subsidizations had the effect of price adjustments. Further, Cocoa Hyundai and Coastal Hyundai received the benefit of tier two advertising placed in the Orlando ADI and paid for in part by Universal Hyundai for free. The actions of [Defendant] created a competitive disadvantage for Universal Hyundai.

(*Id.* at 4, ¶¶ 13, 15.)

Also, Plaintiff filed in the record a series of emails between Barbara Verstappe, an employee at the advertising firm used by both Defendant and the SRAG, and members of Defendant's marketing team. (Doc. No. 105-12.) In one email, Ms. Verstappe states:

> I don't understand why this dealership is being allowed to break off from its designated ADI. Cocoa Hyundai belongs to the Orlando ADI, as does the dealership in Melbourne [Coastal]. It is my understanding from conversations with Mike Murphy that the same person owns both dealerships. If so, his thoughts may be if he was allowed to become a single point with his Melbourne dealership then why not with the Cocoa dealership?
>
> These two dealerships are going to be receiving coverage from the advertising placed by the Orlando dealers, yet they don't have to pay a thing for it. On top of that, as small single points, they get to use their own assessment for additional advertising.

(*Id.* at 2.)

Additionally, Plaintiff has produced several of Defendant's internal memoranda that indicate that the designation of Coastal and Cocoa as single point dealers may have violated Defendant's own internal policies and therefore support Plaintiff's claim that such designations were unreasonable.

(Doc. No. 105-6.)  Thus, Plaintiff has provided evidence that raises a genuine issue of material fact whether Defendant's system of distribution was unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the affected motor vehicle dealer.[10]

Finally, Defendant asserts that Plaintiff has not provided evidence of any damages resulting from the unfair system of distribution.  Generally, so long as Plaintiff has produced some evidence of its injury, the factual determination of damages is one for the jury.  *E.g.*, *Fisher Island Holdings, LLC v. Cohen*, 983 So. 2d 1203, 1204 (Fla. 3d DCA 2008).  Plaintiff has offered evidence of the injury it claims resulted from Defendant's violation of the DPA.  For instance, Plaintiff has produced the sworn statement of Mr. Nero, Plaintiff's owner and operator, in which he states:

> Tier three advertising at the dealership level is critical to the survival of any new motor vehicle franchise dealership in any advertising market such as the Orlando ADI. [Plaintiff] could not compete without committing substantial dollars to tier three advertising. Further, there is a direct relationship between tier three advertising spending and sales.  An increase in advertising expenditures will result an increase in sales.  During the period 1999 through 2005 [Plaintiff] spent, on average, 1.2 million dollars per year for tier three advertising.  This is over and above the more than $3,000,000.00 plus [Plaintiff] paid in mandatory advertising fees assessed and collected by [Defendant] during the same period which was supposed to be pooled with all other dealers in my ADI, including Cocoa Hyundai and Coastal Hyundai, for tier two advertising in the Orlando ADI.

---

[10]    The expert report of John Forsyth also supports Plaintiff's DPA claim.  (Doc. No. 105-10.)  However, pending before the Court is a *Daubert* Motion concerning this expert witness.  (Doc. No. 68, filed Apr. 15, 2008.)  Since the Court has not yet ruled on this Motion, the Court did not consider the opinions of this witness in reaching its conclusion.

(Doc. No. 105-8 at 4, ¶ 16.)  Thus, Plaintiff has provided evidence of damages that raises a jury question on the issue.[11]  Because there are disputed material facts concerning Plaintiff's DPA claim, the Court may not grant summary judgment on Count III.

### III.   Plaintiff's Motion for Partial Summary Judgment (Doc. No. 71)

In its Motion for Partial Summary Judgment, Plaintiff relies extensively on the public policy behind dealer protection statutes and their remedial nature.  (*E.g.*, Doc. No. 71 at 1-4, ¶¶ 2-9.) Plaintiff also sets forth arguments almost identical to those it makes in opposition to Defendant's two Motions for Summary Judgment.  The Court has found that Defendant is entitled to judgment as a matter of law on Count II of the Complaint, and nothing in Plaintiff's Motion for Partial Summary Judgment convinces the Court otherwise.  Plaintiff does not move for summary judgment on Count IV.

Concerning Count I, Plaintiff has offered the affidavit of William Nero to support its claim that Defendant breached Section 10(A)(1) of the franchise agreement by failing to explain its method of distribution.  (Doc. No. 85-6 at 24-25, ¶¶ 12-13.)  In response, Defendant contends that "[t]here is no evidence that [Defendant] failed to explain the method it used to distribute its products or that [Plaintiff] did not understand [Defendant]'s distribution method."  (Doc. No. 103 at 10.) Defendant further claims that the reimbursement of Coastal and Cocoa's advertising assessments was not part of its method of distribution at all because the independent entity SRAG provided the

---

[11]   This finding should not be construed as a conclusion concerning the appropriate measure of damages.  The Court merely finds a genuine issue of material fact whether Plaintiff suffered damages as a result of Defendant's purportedly unfair system of distribution.  The appropriate measure of damages is addressed primarily by Plaintiff's expert, John Forsyth.  (Doc. No. 105-10.)  Again, the Court did not consider the opinions of this expert in reaching its conclusion.

reimbursements. (*E.g.*, *id.* at 1-4; Doc. No. 103-4 at 1-4.) According to Defendant, since this was not part of its distribution method, the failure to advise Plaintiff of the arrangement is not a breach of Section 10(A)(1). Thus, Defendant has raised a genuine issue of material fact whether Coastal and Cocoa's advertising assessment reimbursements may be attributed to Defendant's method of distribution so that Defendant's failure to advise Plaintiff of the arrangement breached Section 10(A)(1) of the franchise agreement.

Regarding the remaining Count III, Defendant has identified disputed factual issues that preclude summary judgment. As just explained, Defendant has offered evidence suggesting that Defendant transferred Coastal and Cocoa's advertising assessments to the SRAG which in turn independently reimbursed Coastal and Cocoa for their Tier Three advertising. (*E.g.*, Doc. No. 103-13 at 3-5; Doc. No. 103-14; Doc. No. 103-19.) This contradicts Plaintiff's evidence that Defendant designated Coastal and Cocoa as single point dealers and retained the accrued assessments itself thereby making the reimbursements a part of Defendant's system of distribution. Defendant has also offered evidence rebutting Plaintiff's claims of unfairness. For instance, Bruce Nelson, Jr., the General Manager of Coastal and Cocoa, stated during his deposition that his dealerships received no benefit from the Tier Two advertising of the Orlando HDAA. (Doc. No. 103-13 at 9-10, 13.) Therefore, according to Mr. Nelson, the reimbursements gave Coastal and Cocoa the same advertising benefits that Plaintiff received through the Orlando HDAA. (*See id.*)

Given these genuine issues of material fact concerning Counts I and III, Plaintiff's Motion for Partial Summary Judgment must be denied.

## Conclusion

Based on the foregoing, it is **ORDERED** and **ADJUDGED**:

1.      Defendant's first Motion for Summary Judgment (Doc. No. 39) is **GRANTED IN PART AND DENIED IN PART**.  The Motion is **GRANTED** as to Count IV and **DENIED** in all other respects.

2.      Plaintiff's Motion for Partial Summary Judgment (Doc. No. 71) is **DENIED**.

3.      Defendant's second Motion for Summary Judgment (Doc. No. 101) is **GRANTED IN PART AND DENIED IN PART**.  The Motion is **GRANTED** as to Count II and **DENIED** as to Counts I and III.

4.      The case shall continue on Counts I and III of the Complaint.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on August 29, 2008.

**PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT**

Copies furnished to:
Counsel of Record